UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

:
MATTHEW CHRISTIANSEN,                              :
:
                                    Plaintiff,    :         15 Civ. 3440 (KPF)
:
                    v.                            :         OPINION AND ORDER
:
OMNICOM GROUP, INC., *et al.*,                     :
:
                                    Defendants.   :
:
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 9, 2016

KATHERINE POLK FAILLA, District Judge:

Plaintiff Matthew Christiansen, an openly gay man who is HIV-positive, brought suit against his employer, DDB Worldwide Communications Group Inc. ("DDB"); DDB's parent company, Omnicom Group, Inc. ("Omnicom"); his former supervisor, Joe Cianciotto; and DDB executives Peter Hempel and Chris Brown (together, "Defendants"). In his First Amended Complaint (or "FAC"), Plaintiff alleges claims for sexual stereotyping, disability-based discrimination, and retaliation in violation of federal, state, and local laws; as well as state-law claims for aiding and abetting discrimination, slander *per se*, intentional infliction of emotional distress, breach of contract, and labor law violations. Defendants, in two separate motions, now move to dismiss the FAC. As set forth in the remainder of this Opinion, Defendants' motions are granted in full.

## BACKGROUND[1]

### A.   Factual Background

In April 2011, Plaintiff Matthew Christiansen began working as Associate Creative Director for the marketing communications firm DDB, a subsidiary of the global marketing network Omnicom.  (FAC ¶¶ 17-18).  From the start of his employment, Plaintiff worked under the supervision of Joe Cianciotto, who in turn worked under the management and supervision of Chris Brown and Peter Hempel.  (*Id.* at ¶ 19).  According to the FAC, Cianciotto frequently taunted and harassed both male and female co-workers, with behavior ranging from public name-calling, to telling a co-worker that "if he [Cianciotto] were gay, he'd like to have gay intercourse with him," to throwing a soda can at an employee.  (*Id.* at ¶ 30).  Plaintiff is an openly gay man, and alleges that Cianciotto subjected him to ridicule and abuse almost immediately due to Cianciotto's animosity toward homosexuals.  (*Id.* at ¶ 2).  Other employees had previously complained to Hempel, Brown, DDB, and Omnicom about Cianciotto's behavior, but "their

---

[1]    The majority of the facts contained in this Opinion are drawn from Plaintiff's FAC (Dkt. #4), and are taken as true for purposes of this motion.  *See Faber* v. *Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)).  Additional facts are drawn from documents relied upon by or integral to Plaintiff's FAC; these are attached as exhibits to defense counsel's declaration, and are referred to as "Feinstein Decl. Ex." (Dkt. #23).  *See Chambers* v. *Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002).  For convenience, the brief filed by Defendants DDB, Omnicom, Hempel, and Brown — in which Cianciotto joins — in support of their motion to dismiss (Dkt. #21, 22) will be referred to as "Def. Br."; Plaintiff's opposition (Dkt. #30) as "Pl. Opp."; Plaintiff's supporting exhibits (Dkt. #29) as "Lask Decl. Ex."; and Defendants' reply brief (Dkt. #31) as "Def. Reply."  Defendant Cianciotto has additionally submitted a separate motion to dismiss and corresponding reply (Dkt. #24, 25, 33), which are referred to as "Cianciotto Br." and "Cianciotto Reply," respectively.

complaints to human resources and management were ignored for years." (*Id.* at ¶ 30 p.6).

Plaintiff alleges several instances of harassment specifically targeted at him. Shortly after Plaintiff began his employment with DDB, "Cianciotto became openly resentful and hostile towar[d] Plaintiff because of his sexual orientation." (FAC ¶ 33). This hostility was expressed in May 2011 through two drawings by Cianciotto on a company whiteboard: Both featured a shirtless, "muscle bound" Plaintiff, and one of the two images placed Plaintiff's torso on the body of a four-legged animal "with a tail and penis, urinating and defecating." (*Id.* at ¶ 34 & Ex. B). A third whiteboard drawing by Cianciotto, displayed in DDB's office space in June 2011, depicted Plaintiff naked, with an erect penis and exaggerated muscles. (*Id.* at Ex. B). The picture includes an air pump being manned by another employee and attached to Plaintiff's wrist, with text next to Plaintiff reading "I'm so pumped for marriage equality," while text by the other employee says, "I fucking hate being pumped." (*Id.*).

In July 2011, Cianciotto produced and circulated to the office an edited version of a poster for the movie "Muscle Beach Party," superimposing pictures of employees' faces onto the bodies of the swimsuit-clad characters. (FAC ¶ 34(D) & Ex. B). Plaintiff's face appears on the body of a woman, dressed in a bikini and reclining on her back with her legs in the air, in what Plaintiff describes as "the gay sexual receiving position." (*Id.*). Plaintiff alleges that an image of this poster was posted on Facebook, and — despite multiple requests

from Plaintiff in October and November 2014 that it be taken offline — was not removed until January 2015.  (*Id.* at ¶¶ 54-56).

In addition to the four images described, Plaintiff alleges two episodes of verbal harassment.  In October 2012, Cianciotto invited employees at a meeting to play a game of "Name that Tune."  (FAC ¶ 30 p.8).  One employee guessed incorrectly, after which Plaintiff correctly named the song; Cianciotto then turned to the first employee and asked how it felt to be "beaten out by the gay guy."  (*Id.*).  Cianciotto then proceeded to tell Plaintiff that his "muscles [were] big," saying, "Everybody look at Matt's muscles."  (*Id.* at ¶ 30 p.7).  Plaintiff further alleges that several months later, at a large meeting in May 2013, a fellow employee coughed, prompting Cianciotto to comment that he too was feeling ill.  (*Id.*).  Cianciotto then turned to Plaintiff and added, "It feels like I ha[ve] AID[S], you know what that's like[,] Matt?"  (*Id.*).  Plaintiff alleges, upon information and belief, that DDB, Omnicom, Hempel, and Brown inferred that Plaintiff had Acquired Immunodeficiency Syndrome ("AIDS") from a combination of (i) the fact that he is gay, and (ii) Human Resources records reflecting his high monthly health insurance costs, and that they then shared their inferred diagnosis with Cianciotto.  (*Id.* at ¶¶ 42-43).

On or about June 26, 2013, Plaintiff met with a representative of DDB's Human Resources Department to complain about Cianciotto's behavior.  (FAC ¶ 47).  Following this meeting, Cianciotto approached Plaintiff to ask whether Plaintiff had reported him to Human Resources.  (*Id.* at ¶ 48).  Cianciotto then explained to Plaintiff that he had "a severe phobia of communicable diseases,"

4

including AIDS, of such magnitude that his doctor had advised him on how to relieve his concerns.  (*Id.* at ¶ 49).

A month after Plaintiff spoke to Human Resources about Cianciotto, DDB convened an employee meeting at which Hempel, the Director of Human Resources, and DDB's Chief Creative Officer were present.  (FAC ¶ 51). Cianciotto provided a general apology at the meeting, "to the effect of hoping that no one was offended by anything he did," and Hempel gave a speech informing those present that "DDB does not tolerate inappropriate behavior." (*Id.* at ¶¶ 51-52).  No further action was taken in regards to Plaintiff's complaints at that time.

Finally, Plaintiff alleges two acts of employment-related misconduct: (i) in October 2012, Plaintiff received a promotion from Associate Creative Director to Creative Director, but did not receive the corresponding salary increase until one year later (FAC ¶¶ 35-36), and (ii) on March 21, 2015, Defendants offered Plaintiff a three-month severance package in exchange for Plaintiff's resignation, which Plaintiff declined (*id.* at ¶ 58).[2]  As of the filing of the FAC, Plaintiff continued to be employed by DDB.  (*Id.* at ¶ 10).

Plaintiff alleges that experiences with sexual-orientation-based discrimination prior to his employment with DDB had caused him to develop post-traumatic stress disorder ("PTSD"), which was then compounded by the

---

[2]     The inclusion of the severance offer as an example of misconduct by Defendants is surprising to the Court, since Plaintiff concedes that it occurred in the course of "a conciliatory process with the State and Federal EEOC because of complaints filed there by Christiansen in 2014."  (Pl. Opp. 2).

physical stress caused by his HIV.  (FAC ¶¶ 68-69).  Plaintiff further alleges
that Defendants' misconduct, in combination with these preexisting conditions,
led him to seek therapy.  (*Id.* at ¶ 78).  On March 30, 2015, psychologist Dr.
Stephen Reich diagnosed Plaintiff with PTSD, anxiety, and depression,
stemming from the "'gay taunts and drawings' that Defendants subjected him
to from 2013 to 2015." (*Id.* at ¶¶ 74-75).  Plaintiff concludes that "[a]s a result
of his physical and mental infirmities, [he] was incapable of filing any
complaints against Defendants." (*Id.* at ¶ 76).

## B.    Procedural Background

On October 29, 2014, Plaintiff submitted a complaint to the Equal
Employment Opportunity Commission (the "EEOC"), setting forth a Title VII
claim against DDB based on allegations that Cianciotto had harassed Plaintiff
and assumed Plaintiff had AIDS "because he is gay." (Feinstein Decl. Ex. C).
Plaintiff subsequently filed a complaint against DDB with the New York State
Division of Human Rights (the "NYSDHR"), stating that he had been
discriminated against on the basis of perceived disability (AIDS) and sexual
orientation.  (*Id.* at Ex. D).  The NYSDHR complaint additionally notes that
Plaintiff suffered retaliation from his supervisor for complaining about the
discrimination.  (*Id.*).  The complaint form provides a space to designate claims
for discrimination based on "sex"; Plaintiff declined to check that box.  (*Id.*).

A Notice of Charge of Discrimination was sent to DDB by the EEOC on
January 13, 2015, indicating that Plaintiff had filed charges of employment
discrimination against DDB under the ADA.  (Feinstein Decl. Ex. D).  On

March 10, 2015, the NYSDHR notified Plaintiff that it was contemplating dismissal of his administrative complaint, pursuant to his request, so that Plaintiff could pursue litigation related to the issues raised in that complaint. (*Id.* at Ex. E). Three days later, on March 13, 2015, Plaintiff received a Notice of Right to Sue from the EEOC. (FAC ¶ 6(b)). DDB submitted a letter in opposition to the proposed dismissal of Plaintiff's NYSDHR complaint on March 24, 2015 (Feinstein Decl. Ex. F); and on July 21, 2015, the NYSDHR notified the parties that Plaintiff's administrative complaint would be annulled (*id.* at Ex. G).

Plaintiff filed his initial Complaint in the instant matter on May 4, 2015 (Dkt. #1), and his FAC on June 22, 2015 (Dkt. #4). Defendants Omnicom, DDB, Hempel, and Brown jointly filed their motion to dismiss on July 31, 2015. (Dkt. #21, 22). Cianciotto filed a separate motion to dismiss on August 14, 2015. (Dkt. #24, 25). Plaintiff set forth his opposition to both motions in a single brief, filed on September 24, 2015 (Dkt. #30); Defendants Omnicom, DDB, Hempel, and Brown replied on October 8, 2015 (Dkt. #31); and Cianciotto concluded the briefing with the filing of his reply on October 8, 2015 (Dkt. #33).

## DISCUSSION

### A. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and

determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "While Twombly does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 663.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)

(quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).[3]

### B.    Plaintiff Has Adequately Pleaded That Omnicom Is His Employer

As an initial matter, Defendants contend that Plaintiff's claims against Omnicom must fail because Omnicom is not Plaintiff's employer.  (Def. Br. 21-22).  Plaintiff responds that DDB and Omnicom are functionally a "single employer," such that employment discrimination liability attaches to both entities.  (Pl. Opp. 22-23).

An employer-employee relationship is a required element of an employment discrimination claim under the ADA, Title VII, or the NYSHRL. *See Gulino* v. *N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006) (Title VII); *Heller* v. *Consol. Rail Corp.*, 331 F. App'x 766, 768 (2d Cir. 2009) (summary order) (Title VII and the ADA); *Eisenberg* v. *Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000) (the NYSHRL).  "To prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other." *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000).

---

[3]    Cianciotto alone seeks to dismiss the FAC for failing to comply with Rule 8's requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  (Cianciotto Br. 7-8).  While the Court acknowledges that the FAC is frequently circuitous, it also recognizes that the Second Circuit has generally reserved dismissals under Rule 8 "for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  *Salahuddin* v. *Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).  Such is not the case here.

The Second Circuit has adopted a four-part test to determine when, for the purposes of a Title VII or ADA claim, a parent company may be considered the employer of a subsidiary's employee. *Brown* v. *Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014). Under this test, a parent and subsidiary may be found to constitute a single employer where there is evidence of "[i] interrelation of operations, [ii] centralized control of labor relations, [iii] common management, and [iv] common ownership or financial control." *Id.* (quoting *Cook* v. *Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)). In the main, "[w]hether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss." *Id.* at 226.

In the present matter, Plaintiff has alleged sufficient facts to support Omnicom's employer liability for purposes of the instant motion. Plaintiff asserts that Omnicom "exercises extensive control" over DDB's "operations and personnel decisions." (FAC ¶ 12). Plaintiff further alleges that Omnicom "controlled [his] health, retirement and other benefits" (*id.* at ¶ 18), and that the policies contained in the DDB Employee Handbook were established and promulgated by Omnicom (*id.* at ¶ 22 (quoting the Employee Handbook as setting forth that "[a]s an employee of the Company, you have an obligation to conduct business according to the Omnicom Code of Business Conduct")). It is entirely possible that discovery will reveal an insufficient degree of integration for Omnicom and DDB to fairly be called a "single employer"; at this stage in the litigation, however, Plaintiff has alleged sufficient facts to establish

10

employment discrimination liability against Omnicom as part of an integrated enterprise with his direct employer, DDB.

## C. Plaintiff Fails to State a Claim for Disability Discrimination in Violation of the ADA or the NYSHRL

### 1. Applicable Law

Courts analyze disability discrimination claims under the ADA and the NYSHRL in an identical manner. *See, e.g.*, *Kinneary* v. *City of New York*, 601 F.3d 151, 158 (2d Cir. 2010). A valid claim under either law requires that (i) the employer is subject to the relevant law, (ii) the plaintiff experiences or is perceived by his employer as experiencing a disability within the meaning of that law, (iii) the plaintiff was qualified for his position, (iv) he suffered an adverse employment action, and (v) the adverse action was motivated by the plaintiff's disability. *Davis* v. *N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015).

The ADA additionally prescribes the following procedural prerequisites to filing a federal suit: (i) "the claims forming the basis of [a federal suit] must first be presented in a complaint to the EEOC or the equivalent state agency," (ii) the charge must be filed with the EEOC within 180 days of the allegedly unlawful act, or with an equivalent state or local agency within 300 days, and (iii) the plaintiff must obtain a "Notice of Right to Sue" letter from the EEOC. *Williams* v. *N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006); *see also* 42 U.S.C. § 12117 (incorporating Title VII exhaustion requirements into the ADA). The parties contest the first two of these requirements.

11

"A district court may only hear claims that are either included in the EEOC charge or are based on conduct which is reasonably related to conduct alleged in the EEOC charge." *Fiscina* v. *N.Y.C. Dist. Council of Carpenters*, 401 F. Supp. 2d 345, 356 (S.D.N.Y. 2005) (citation and internal alterations omitted); *see generally Legnani* v. *Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (noting that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency" (quoting *Shah* v. *N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 614 (2d Cir. 1999)). The Second Circuit further instructs that "[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Williams*, 458 F.3d at 70 (quoting *Fitzgerald* v. *Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001).

"This exception to the exhaustion requirement is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." *Deravin* v. *Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (internal quotation marks omitted). To determine whether a claim is "reasonably related" to a claim included in an EEOC charge, courts should focus "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and ask the "central

question" of "whether the complaint filed with the EEOC gave the agency adequate notice to investigate discrimination on both bases." *Williams*, 458 F.3d at 70 (citation omitted).

### 2.    Analysis

#### a.    Plaintiff Satisfies the ADA's Exhaustion Requirement

Plaintiff alleges violations of the ADA against both DDB and Omnicom. (FAC ¶¶ 81-90). Defendants contend that Plaintiff failed to exhaust his administrative remedies in regards to his disability discrimination claim because his EEOC complaint neither identified such a claim (listing only his Title VII claim), nor asserted any underlying factual content that would give the EEOC "adequate notice to investigate discrimination" on the basis of his HIV-positive status or the perception that he had AIDS. (Def. Br. 7-8).[4] Plaintiff

---

[4]    Defendants additionally argue that Plaintiff has failed to exhaust his remedies against Omnicom because Plaintiff did not name Omnicom in his administrative complaints. (Def. Br. 22-23). Plaintiff does not appear to respond to this contention.

Under the Second Circuit's "identity of interests" test, a court deciding whether the naming of a subsidiary in an EEOC complaint serves to exhaust administrative remedies against the parent company should consider "[i] whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; [ii] whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; [iii] whether its absence in the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; and [iv] whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party." *Cook* v. *Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241-42 (2d Cir. 1995). While the first of these factors weighs against Plaintiff, the pleading as to the remaining factors suggests that exhaustion of remedies against DDB would suffice to exhaust against Omnicom: Plaintiff alleges that counsel for Omnicom participated in a "conciliatory mediation process" with Plaintiff and has received notice of all charges filed (FAC ¶ 20); that Omnicom "exercises extensive control" over DDB's "operations and personnel decisions" (*id.* at ¶ 12); and that rules regarding employee conduct were directly established by Omnicom (*id.* at ¶¶ 21-22). Consequently, the Court finds that at this stage of the litigation, Plaintiff has pleaded sufficient facts to support his contention that naming DDB in his administrative complaints relieved him of his obligation to name Omnicom separately.

responds that his EEOC grievance letter set forth conduct "reasonably related" to his ADA allegations, and, furthermore, that his disability-based claim was clearly identified in his subsequent complaint filed with the NYSDHR.  (Pl. Opp. 8-11).

The Court agrees with Defendants that Plaintiff's EEOC complaint fails to set forth sufficient information regarding Defendants' purported ADA violations.  The only mentions of AIDS in the EEOC charge are in the context of Plaintiff's supervisor assuming that Plaintiff had AIDS because he is gay; in other words, they support Plaintiff's assertion of discrimination based on his sexual orientation, but do not provide notice of a claim for disability discrimination.  *Cf. Peterson* v. *Ins. Co. of N. Am.*, 884 F. Supp. 107, 109 (S.D.N.Y. 1995) ("[C]ourts will not permit a claim that is based on a wholly different type of discrimination to be brought if it was not initially asserted in the EEOC charge.").

The substantive deficiency in Plaintiff's EEOC complaint is remedied, however, by his subsequently-filed NYSDHR grievance.  ADA exhaustion requires that "the claims forming the basis of [a federal suit] must first be presented in a complaint to the EEOC *or the equivalent state agency.*" *Williams,* 458 F.3d at 70 (emphasis added); *see also Pimentel* v. *City of New York*, No. 00 Civ. 326 (SAS), 2000 WL 1576871, at *1 (S.D.N.Y. Oct. 23, 2000) (declining to dismiss a plaintiff's ADA claim for failure to exhaust where plaintiff raised the claim in a complaint to the NYSDHR); *see generally Ofori-Awuku* v. *Epic Sec.*, No. 00 Civ. 1548 (AGS), 2001 WL 180054, at *3 (S.D.N.Y.

Feb. 23, 2001) (stating that the NYSDHR may grant or seek relief for ADA employment discrimination violations).

In the present matter, Plaintiff filed a complaint with the NYSDHR explicitly asserting a claim of disability discrimination, and received, on January 13, 2015, a confirmation letter from the EEOC providing the EEOC Charge Number and indicating that his charge under the ADA had been received. (Feinstein Decl. Ex. D). Plaintiff subsequently received a letter on March 10, 2015, stating that pursuant to his request, the NYSDHR was considering dismissing his administrative complaint to allow him to pursue his claims in federal court. (*Id.* at Ex. E). Three days later, on March 13, 2015, Plaintiff received a Notice of Right to Sue from the EEOC. (FAC ¶ 6(b)). The record thus reflects that the EEOC clearly received notice of Plaintiff's ADA claim, and of the fact that the claim arose out of conduct closely related to his Title VII discrimination claim, well before issuing its Right to Sue letter. Accordingly, Plaintiff has satisfied the ADA's exhaustion requirement.

### b.     Plaintiff's ADA Claim Is Time-Barred

Failure to exhaust is only one form of procedural bar. A plaintiff claiming ADA disability discrimination also has a limitations period within which he must act; specifically, the plaintiff must file a charge with the EEOC within 180 days of the allegedly unlawful act giving rise to the Plaintiff's claim, or with an equivalent state or local agency within 300 days. *Williams*, 458 F.3d at 69. Plaintiff asserts that he is disabled within the meaning of the ADA by virtue of his status as an HIV-positive individual who was perceived by his

supervisor and employer as having AIDS.  (FAC ¶¶ 30, 60, 80, 86-90).  As such, his claim for disability discrimination must necessarily rest on — and be filed within 300 days of — a discriminatory act motivated by his status as an individual with HIV or AIDS.

Plaintiff's FAC pleads two instances of AIDS-related discrimination: (i) Defendant Cianciotto's May 2013 comment that, "[i]t feels like I ha[ve] AID[S], you know what that's like[,] Matt?" (FAC ¶ 30 p.7), and (ii) Plaintiff's "constructive discharge," based at least in part on his status as an HIV-positive or AIDS-infected individual, in March 2015 (*id.* at ¶¶ 60, 86-87).  Since filing the FAC, Plaintiff has wisely abandoned his constructive discharge allegation, as he continues to be employed with DDB.  (Lask Decl. ¶ 1).  *See Petrosino* v. *Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004) ("[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is *forced to quit involuntarily.*" (emphasis added)).  This leaves Cianciotto's May 2013 comment as the only allegation of explicitly disability-based discrimination in the FAC. Plaintiff did not file his NYSDHR complaint until December 17, 2014, placing his ADA claim well outside the applicable 300-day limitation period set forth in 42 U.S.C. §§ 2000e-5(e) and 12117.  (Feinstein Decl. Ex. D).  Plaintiff's disability discrimination claim under the ADA is therefore time-barred.[5]

---

[5]    While Plaintiff's NYSHRL disability discrimination claim is analyzed under the same framework as his claim under the ADA, the applicable limitations period for his NYSHRL claim is three years.  N.Y.C.P.L.R. § 214(2).  Thus his claim for disability discrimination under that statute, unlike his ADA claim, is timely.  As discussed further in this Opinion, however, it fails on the merits.

### c.   Even Were Plaintiff's ADA Claim Timely, Both It and His NYSHRL Disability Discrimination Claim Fail on the Merits

#### i.   Plaintiff Fails to Allege a Disability-Based Hostile Work Environment Claim or a Continuing Violation

While it is not entirely clear from the FAC that Plaintiff is alleging disability discrimination under a hostile work environment theory — the portion of the FAC outlining his ADA claim discusses almost exclusively Plaintiff's now-abandoned theory of "constructive discharge" — Plaintiff's brief in opposition tries to save his ADA claim by positioning Cianciotto's May 2013 comment as part of a "continuing violation" that extended through at least January 2015.  (Pl. Opp. 19).  Plaintiff's continuing violation and hostile work environment arguments fail, both as means of extending any limitations period and on the merits.

The "continuing violations" doctrine extends the ADA's 300-day filing period where a plaintiff alleges that a hostile work environment has been created by continuing acts of discrimination as part of an official policy or mechanism of discrimination.  *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 114-18 (2002).  Essential to application of the continuing violations theory, however, is an allegation that at least one discrete act of discrimination occurred within the 300 day period.  *See Bonner* v. *Guccione,* 178 F.3d 581, 584 (2d Cir. 1999).  Plaintiff fails to allege any specific act of disability-based discrimination within the limitations period.  More fundamentally, however, the totality of Plaintiff's pleadings fail to allege sufficient disability-based discrimination to sustain an ADA hostile work environment claim.

As a threshold matter, the Second Circuit has not directly ruled on whether hostile work environment claims are cognizable under the ADA.  *See Robinson* v. *Dibble*, 613 F. App'x 9, 13 n.2 (2d Cir. 2015) (summary order) ("We have not yet decided whether a hostile work environment claim is cognizable under the ADA."); *see also Giambattista* v. *Am. Airlines, Inc.*, 5 F. Supp. 3d 284, 294 (E.D.N.Y.) (assuming the viability of a hostile work environment claim under the ADA, but finding it insufficiently alleged in that case), *aff'd,* 584 F. App'x 23 (2d Cir. 2014) (summary order).  A number of other Circuits, as well as district courts within the Second Circuit, have recognized such claims, applying the same standard applicable to hostile work environment claims under Title VII.  *See, e.g., Shaver* v. *Indep. Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003); *Fox* v. *Gen. Motors Corp.*, 247 F.3d 169, 175-76 (4th Cir. 2001); *Flowers* v. *S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 232-35 (5th Cir. 2001); *Lewis* v. *Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 309 (S.D.N.Y. 2014); *Forgione* v. *City of New York*, No. 11 Civ. 5248 (JG), 2012 WL 4049832, at *10 & n.6 (E.D.N.Y. Sept. 13, 2012).

Assuming that Plaintiff can bring an ADA claim under a hostile work environment theory, he

> must plead facts that would tend to show that the complained of conduct: [i] is objectively severe or pervasive — that is, ... creates an environment that a reasonable person would find hostile or abusive; [ii] creates an environment that the plaintiff subjectively perceives as hostile or abusive; and [iii] creates such an environment because of [his disability].

*Patane* v. *Clark,* 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory* v. *Daly,* 243 F.3d 687, 691-92 (2d Cir. 2001) (internal quotation marks omitted)).  To succeed on a hostile work environment claim, "[t]he plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered."  *Alfano* v. *Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  Generally speaking, the discriminatory acts must "be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'... But it is well-settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."  *Id.* (quoting *Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

The sum total of Plaintiff's disability-related allegations are as follows:

- Plaintiff is HIV positive, and alleges that Defendants perceived him as having AIDS — a perception engendered by the fact that he is openly gay, and which was allegedly reinforced at some later date through inferences drawn from his medical insurance records.  (FAC ¶¶ 11, 42-43).

- In May 2013, Cianciotto was feeling ill and said at a meeting that "[i]t feels like I ha[ve] AID[S], you know what that's like[,] Matt?"  (*Id.* at ¶ 30 p.7).

- Cianciotto is not alleged to have made any other comments related to Plaintiff's medical status.  After Plaintiff met with DDB's Human Resources Director, however, Cianciotto approached Plaintiff to explain that he had a severe phobia of communicable diseases, including AIDS.  (*Id.* at ¶ 49).

- Finally, Plaintiff alleges that he was asked to leave his employment at least in part because he was perceived to have AIDS.  (*Id.* at ¶¶ 60, 87).

These incidents, whether considered individually or in combination, fail to demonstrate an environment "so severely permeated with discriminatory intimidation, ridicule, and insult" as to alter the terms and conditions of Plaintiff's employment. [6]

The Court does not foreclose the possibility that under some circumstances, the disclosure of an individual's sensitive medical information might plausibly constitute discrimination so severe as to "work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374. No facts are alleged, however, to suggest that such transformation occurred here. After Cianciotto's May 2013 comment, Plaintiff's responsibilities, compensation, and position remained the same, and his co-workers made no mention of his medical status and treated him no differently. To be sure, Plaintiff alleges that Cianciotto's comment took an emotional toll on him; but subjective perception is only one element of a hostile work environment. *See Patane,* 508 F.3d at 113 (describing both an objective and a subjective prong to a hostile work environment claim). On these pleadings, Cianciotto's single off-handed

---

[6]     Plaintiff additionally alleges two instances of AIDS-related commentary from Cianciotto directed at other employees: Cianciotto stated to an employee with a buzz haircut that the employee "looked like an AIDS patient," and remarked upon hearing that another employee had pneumonia, "Well, be glad [it's] not AIDS." (FAC ¶ 30 p.9). The Court recognizes that in determining whether a hostile work environment exists, "the crucial inquiry focuses on the nature of the workplace environment as a whole," and that therefore "a plaintiff who [him]self experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support [his] claim." *Kaytor* v. *Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (emphases omitted) (quoting *Cruz* v. *Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). In this case, however, the two additional comments — while in poor taste — are not obviously discriminatory; they certainly do not establish conduct so "severe" and "pervasive" such that, taken together with Plaintiff's other allegations, they would establish a hostile work environment. *Alfano* v. *Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

comment — distasteful though it may have been — was not "severe ... enough to create an objectively hostile or abusive work environment."

In addition to the May 2013 statement by Cianciotto previously discussed, Plaintiff alleges further inappropriate actions by his supervisor, but none of those actions was causally related to Plaintiff's asserted disability.  *See, e.g.*, *Marini* v. *Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 326 (D. Conn. 2014) ("A hostile work environment claim requires more than just a hostile work environment — it requires proof that hostile acts were based on plaintiff's protected status (*e.g.,* his disability), rather than other reasons."), *reconsideration denied,* No. 11 Civ. 331 (JAM), 2015 WL 1169284 (D. Conn. Mar. 13, 2015).  Specifically, Plaintiff alleges that, shortly after he began working under Cianciotto's supervision, "Cianciotto became openly resentful and hostile towards Plaintiff because of his sexual orientation."  (FAC ¶ 33). Plaintiff further alleges that Cianciotto expressed his animosity by "harassing, intimidating, and mistreating Plaintiff as a homosexual male by drawing offensive sketches and creating other pictures of Plaintiff in a sexually suggestive manner."  (*Id.* at ¶ 34).

Save for Cianciotto's comment at the May 2013 meeting, every instance of discrimination alleged by Plaintiff centers on his sexual orientation; they make no reference to AIDS or illness.  The ADA specifically protects against discrimination *on the basis of an individual's disability*; it does not protect an individual against harassment generally.  *See, e.g., Castro* v. *City of New York*, 24 F. Supp. 3d 250, 271 (E.D.N.Y. 2014) (dismissing a hostile work

environment claim where there was "no basis upon which to conclude that the delay in compensation and the assignment of physical tasks occurred *because* plaintiff was disabled" (emphasis in original)).[7]

Statements mocking or making light of the notion that an individual may suffer from a life-threatening illness are inappropriate, to say the least. However, because the alleged instances of discriminatory conduct based on Defendants' perception that Plaintiff had AIDS fail to rise to the level necessary to constitute a hostile work environment claim, Plaintiff's claims for disability discrimination in violation of the ADA and the NYSHRL fail on the merits.

### ii. Plaintiff Fails to Demonstrate a Basis for Equitable Tolling or an Adverse Employment Action

As a fallback position to his continuing violation argument, Plaintiff contends that any relevant limitations periods for his claims should be tolled, as (i) the treatment he received from Cianciotto caused him such psychological trauma that he was unable to file a timely claim, and (ii) DDB never informed him of his right to pursue discrimination claims with the EEOC.  (Pl. Opp. 17-19).  Defendants argue in response that Plaintiff's own allegations doom his equitable tolling argument, as he was capable of complaining to Human Resources in June 2013; filing three separate complaints between 2014 and

---

[7]     In alleging that "Cianciotto targeted him as having AIDS … because he was gay" (FAC ¶ 2), Plaintiff conflates sexual-orientation-based actions with discrimination based on the perception that he had AIDS.  Assuming that Plaintiff had AIDS does not constitute discrimination *based on that assumption*; rather, it represents a discriminatory assumption *based on Plaintiff's sexual orientation*.  In other words, according to Plaintiff's pleadings, both the assumption that he had AIDS and Cianciotto's harassment stemmed from a common cause (namely, animus toward Plaintiff's sexual orientation).  That does not make them causally related to each other.

2015; and working continuously for DDB during the period from April 2011 to the present.  (Def. Reply 6).  Regarding notice of Plaintiff's right to file with the EEOC, Defendants contend, *inter alia*, that they had no legal obligation to inform Plaintiff of such rights.  (*Id.* at 6 n.7).

"Equitable tolling is only appropriate in 'rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising [his] rights.'"  *Paneccasio* v. *Unisource Worldwide, Inc.*, 532 F.3d 101, 112 (2d Cir. 2008) (quoting *Zerilli-Edelglass* v. *N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003)).  In light of Plaintiff's ability both to continue working — and at such a level as to receive a promotion — and to lodge a complaint with Human Resources during the very period for which he alleges the limitations period should be tolled, Plaintiff's case is easily distinguishable from the case law on which he relies.  (*See* Pl. Opp. 17-18 (citing *Tsai* v. *Rockefeller Univ.*, 137 F. Supp. 2d 276, 281-83 (S.D.N.Y. 2001))).

As for Plaintiff's claim that DDB failed to inform him of his right to complain to the EEOC, it is true that DDB had an obligation to display a poster informing employees of their rights under the Equal Employment Opportunity Act.  Plaintiff alleges neither the presence nor the absence of such a poster. But even assuming that DDB failed to discharge its responsibility in this regard, such failure would not constitute the sort of "affirmative misconduct … aimed at causing [a plaintiff] to forgo his legal rights," so as to warrant equitable tolling.  *Long* v. *Frank*, 22 F.3d 54, 59 (2d Cir. 1994).  This is particularly so given Plaintiff's allegation that a co-worker filed a complaint

against DDB with the EEOC in 2012, for which other DDB employees provided supporting testimony — thereby demonstrating that other employees were familiar with the EEOC charge process.  (FAC ¶ 30 p.6).  The Court strongly doubts the applicability of equitable tolling in this case.  It need not decide this issue, however, as Plaintiff's disability discrimination claims fail on the merits, for the reasons stated in the preceding section and an additional reason discussed in this section.

Plaintiff fails to allege that he suffered an adverse employment action within the meaning of the ADA and the NYSHRL; therefore his claims under those statutes must fail.  A plaintiff suffers an "adverse employment action" for the purposes of the ADA when "he or she endures a 'materially adverse change' in the terms and conditions of employment."  *Galabya* v. *N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000) (citing *Richardson* v. *N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)).  A materially adverse change is a change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (quoting *Crady* v. *Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)).  "Examples of materially adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices … unique to a particular situation."  *Feingold* v. *New York*, 366 F.3d 138, 152 (2d Cir. 2004) (quoting *Galabya,* 202 F.3d at 640) (ellipsis in original).

As noted *supra*, Plaintiff has abandoned his assertion of disability-based constructive discharge.  (Lask Decl. ¶ 1).  This does not necessarily mean, of course, that he has withdrawn the factual contentions underlying that claim; as relevant to his disability discrimination claims, these include the contention that the corporate Defendants "request[ed] Plaintiff to leave his employment without any basis regarding his work performance after he complained to the EEOC and indicated that he actually had HIV."  (FAC ¶ 86).  Plaintiff did not, however, leave his employment.  On the contrary, as of the filing of his FAC, he continued to hold his position at DDB.  Nor does Plaintiff allege any demotion, salary reduction, loss of benefits, or change to his responsibilities as a consequence of his disability; in fact, the only change in employment conditions that Plaintiff alleges as having occurred during his tenure with DDB consists of a promotion and a raise.  (*Id.* at ¶¶ 35-36).[8]  The mere offering of a

---

[8]     Plaintiff does allege a one-year delay in receiving the salary increase that accompanied his promotion.  (FAC ¶ 36).  The FAC provides no suggestion that this delay was in any way related to Plaintiff's medical status; to the contrary, the temporary withholding occurred months prior to any mention by Cianciotto of his associating Plaintiff with AIDS.  Additionally, "a plaintiff seeking to assert a discrimination claim based on a delay in the receipt of compensation faces a substantial hurdle."  *Castro* v. *City of New York*, 24 F. Supp. 3d 250, 262 & n.24 (E.D.N.Y. 2014).  Courts in the Second Circuit have consistently held that paycheck delays do not constitute an "adverse employment action" for purposes of making a *prima facie* employment discrimination or retaliation claim.  *See Bobbitt* v. *N.Y.C. Health and Hosp. Corp.*, No. 08 Civ. 10765 (SAS), 2009 WL 4975196, at *9 n.130 (S.D.N.Y. Dec. 22, 2009) (listing cases in which delayed paychecks were found not to constitute an adverse employment action).  This is particularly so where the delay does not interrupt a preexisting schedule of payments, such that the withholding could not be said to constitute a "materially adverse change" to the terms and conditions of a plaintiff's employment.  *Castro*, 24 F. Supp. 3d at 263; *see also Bobbitt*, 2009 WL 4975196, at *9 ("A delay in receiving [a] workers' compensation check does not change the terms or conditions of [the plaintiff's] employment.").  Even assuming the delay could conceivably constitute an adverse employment, however, the lack of any connection to Plaintiff's proffered disability would preclude the delayed payment from supporting Plaintiff's disability discrimination claims.

severance package to Plaintiff does not itself constitute an adverse employment action, in light of the fact that Plaintiff alleges no negative consequences arising from his refusal to leave DDB.

For all of these reasons, even had Plaintiff's ADA claim been found timely, both that claim and his NYSHRL disability claim were nevertheless doomed to fail on the merits.  They will therefore be dismissed.

## D.    Plaintiff Fails to State a Claim for Retaliation Under the ADA, Title VII, or the NYSHRL

Plaintiff asserts claims for retaliation under the ADA, Title VII, and the NYSHRL, all three of which are analyzed under the same framework.  *See Weissman* v. *Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (comparing retaliation provisions under ADA and NYSHRL); *Sarno* v. *Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (comparing retaliation provisions under ADA and Title VII).  In order to make out a *prima facie* case under any of these statutes, a plaintiff must show that (i) he engaged in protected activity, (ii) his employer was aware of that protected activity, (iii) his employer took adverse action against him, and (iv) "a retaliatory motive played a part in the adverse employment action."  *Sista* v. *CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006) (quoting *Reg'l Econ. Cmty Action Program, Inc.* v. *City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002)).  In the present case, Plaintiff fails to allege any adverse employment action taken against him.  Consequently, his claims for retaliation, whether construed as related to his allegations of disability discrimination or sexual orientation discrimination, cannot stand.

26

An employment action in the retaliation context is adverse if it "would have been materially adverse to a reasonable employee or job applicant." *Hicks* v. *Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotations omitted). "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 57 (2006)).  Here, the only negative action allegedly taken subsequent to Plaintiff's protected activity — his filing of complaints with the EEOC and NYSDHR — was the offering of a severance package that Plaintiff was free to accept or decline (and which he did in fact decline, with no adverse consequences).  (FAC ¶¶ 10, 58).  Nothing about the offer of a severance package, absent some indication that a complainant did or would suffer negative repercussions should he or she reject the offer, would tend to dissuade a reasonable employee from engaging in protected activity.  Plaintiff's retaliation claims are therefore dismissed.

## E.    Plaintiff Fails to State a Claim for Discrimination Under Title VII

### 1.    Applicable Law

"Under Title VII of the Civil Rights Act of 1964, 'it shall be unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Absent direct evidence of discrimination, a *prima facie*

case of Title VII discrimination requires a showing that (i) the plaintiff is a member of a protected class; (ii) he was qualified for the position he held; (iii) he suffered an adverse employment action; and (iv) the adverse action took place under circumstances giving rise to an inference of discrimination.  *See, e.g., Reynolds* v. *Barrett,* 685 F.3d 193, 202 (2d Cir. 2012); *Ruiz* v. *County of Rockland,* 609 F.3d 486, 491-92 (2d Cir. 2010).

To survive a motion to dismiss "a complaint in a discrimination lawsuit need not contain specific facts establishing a *prima facie* case of discrimination[.]"  *Twombly*, 550 U.S. at 569 (internal alteration omitted) (quoting *Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506, 508 (2002)).  Rather, at the pleading stage, "a plaintiff 'need only give plausible support to a minimal inference of discriminatory motivation.'"  *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting *Littlejohn* v. *City of New York*, 795 F.3d 297, 306 (2d Cir. 2015)).

### 2.   Analysis

#### a.   Plaintiff's Title VII Claims Against the Individual Defendants Fail Because Title VII Does Not Provide For Individual Liability

The FAC does not make clear which claims are being asserted against which Defendants.  Defendants correctly note (*see* Def. Br. 23; Cianciotto Br. 2) that, to the extent Plaintiff asserts claims for Title VII discrimination against Cianciotto, Hempel, and Brown, such claims must fail on the grounds that Title VII does not provide for individual liability.  *See Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (holding "that an employer's agent may not be held

individually liable under Title VII"), *abrogated on other grounds by Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998).

> **b.   Plaintiff's Title VII Claims Against the Corporate Defendants Fail on the Merits Under Governing Second Circuit Law**

Plaintiff alleges that Cianciotto, his supervisor at DDB, was "openly hostile and resentful" toward Plaintiff "because of his sexual orientation." (FAC ¶ 33). In support of this contention, Plaintiff provides numerous examples of Cianciotto's allegedly anti-gay behavior, including three lewd drawings of Plaintiff on an office whiteboard; a movie poster, circulated to the office and posted on Facebook, depicting Plaintiff's head on the body of a bikini-clad woman "in the gay sexual receiving position"; a comment made to a co-worker in which Cianciotto stated that "if he were gay, he'd like to have gay intercourse with [the co-worker]"; and a question posed to another employee during a trivia game asking how it felt to "be beaten out by the gay guy." (*Id.* at ¶¶ 30, 34).

By any metric, the conduct alleged is reprehensible. Defendants move to dismiss Plaintiff's Title VII claim, however, on the ground that discrimination claims based on sexual orientation are simply not cognizable under Title VII. (Def. Br. 9-10). Plaintiff responds by arguing that Title VII should be expanded to recognize sexual orientation claims; and that in any case, he has asserted a viable claim based not on sexual orientation, but rather on sexual stereotyping. (Pl. Opp. 12-14; *see also* FAC 19 (titling Plaintiff's second cause of action "Title VII Stereotypical Animus")). Under the law as it currently stands, the Court is constrained to find that Plaintiff has not stated a cognizable claim for Title VII discrimination.

In *Simonton* v. *Runyon*, 232 F.3d 33 (2d Cir. 2000), the Second Circuit unequivocally held that "Title VII does not proscribe discrimination because of sexual orientation." *Id.* at 36.  In reaching this conclusion, it cited "Congress's rejection, on numerous occasions, of bills that would have extended Title VII's protection to people based on their sexual preferences." *Id.* at 35 (citing, e.g., Employment Nondiscrimination Act of 1996, S. 2056, 104th Cong. (1996); Employment Non-Discrimination Act of 1995, H.R. 1863, 104th Cong. (1995); Employment Non-Discrimination Act of 1994, H.R. 4636, 103d Cong. (1994)). The *Simonton* Court additionally looked to the other protected classifications under Title VII, reasoning that when read alongside the categories of race, color, religion, or nationality, "sex" could logically only refer to a class "delineated by gender, rather than sexual activity regardless of gender." *Id.* (quoting *DeCintio* v. *Westchester County Med. Ctr.*, 807 F.2d 304, 306-07 (2d Cir. 1986)).[9]  The *Simonton* Court drew a distinction, however, between claims based on discrimination targeting sexual orientation and those based upon nonconformity with sexual stereotypes — the latter of which the Second Circuit has since recognized *are* cognizable under Title VII, but "should not be used to 'bootstrap protection for sexual orientation into Title VII.'" *Dawson* v. *Bumble & Bumble*, 398 F.3d 211, 218-21 (2d Cir. 2005) (quoting *Simonton*, 232 F.3d at 38); *see also Kiley* v. *Am. Soc. for Prevention of Cruelty to Animals*, 296 F. App'x

---

[9]    The Court notes that to the extent that sexual orientation is argued to be dissimilar to the classes expressly protected under Title VII because it is based on "activity" rather than personal traits, the inclusion of religion in the text of Title VII would appear to disprove that argument.

107, 109 (2d Cir. 2008) (summary order) ("Plaintiffs may bring Title VII claims alleging that an adverse employment decision was due in part to sexual stereotyping by the employer," but "may not use a gender stereotyping claim to bootstrap protection for sexual orientation into Title VII." (internal quotation marks omitted)).

The broader legal landscape has undergone significant changes since the Second Circuit's decision in *Simonton*. In 2013, the Supreme Court issued an opinion striking down the Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7 and 28 U.S.C. § 1738C, which amended the Dictionary Act — the statute providing rules of construction for a multitude of federal laws and regulations — to define "marriage" and "spouse" as excluding same-sex partners. *See generally United States* v. *Windsor*, 133 S. Ct. 2675 (2013). In so doing, the Supreme Court found that DOMA violated the equal protection guarantee contained within the Fifth Amendment to the United States Constitution by "refusing to acknowledge a status the [individual states recognizing same-sex marriage] find[] to be dignified and proper." *Id.* at 2696. Two years later, the Court further advanced protections for individuals in same-sex relationships when it ruled that, under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, same-sex couples have the right to marry. *Obergefell* v. *Hodges*, 135 S. Ct. 2584, 2604-05 (2015).

To be sure, neither of these cases impacts the issue of what protections Title VII affords; that said, they reflect a shift in the perception, both of society and of the courts, regarding the protections warranted for same-sex

31

relationships and the men and women who engage in them.  It is against this backdrop that in July 2015 the EEOC issued a decision, binding on federal agencies (though not federal courts), finding that claims for sexual orientation discrimination *are* cognizable under Title VII.  *See* EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 16, 2015); *see generally McMenemy* v. *City of Rochester*, 241 F.3d 279, 284 (2d Cir. 2001) (concluding that EEOC interpretation of Title VII and its terms is "entitled to respect" to the extent it has the "power to persuade," pursuant to *Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1944)).

Further highlighting the degree to which times have changed since *Simonton*, numerous cases have demonstrated the difficulty of disaggregating acts of discrimination based on sexual orientation from those based on sexual stereotyping.  *See, e.g., Dawson*, 398 F.3d at 218 ("gender stereotyping claims can easily present problems for an adjudicator.  This is for the simple reason that stereotypical notions about how men and women should behave will often necessarily blur into ideas about heterosexuality and homosexuality." (internal quotation marks and alteration omitted)); *Boutillier* v. *Hartford Pub. Sch.*, No. 13 Civ. 1303 (WWE), 2014 WL 4794527, at *2 (D. Conn. Sept. 25, 2014) (finding that, "[c]onstrued most broadly," the plaintiff's allegations of sexual orientation discrimination also stated discriminatory treatment based on sexual stereotypes); *Videckis* v. *Pepperdine Univ.,* No. 15 Civ. 298 (DDP), 2015 WL 1735191, at *8 (C.D. Cal. 2015) (observing, in the context of Title IX, that "the line between discrimination based on gender stereotyping and discrimination

based on sexual orientation is blurry, at best, and thus a claim that Plaintiffs were discriminated against on the basis of ... their sexual orientation may fall within the bounds of Title IX."); *Bianchi* v. *City of Philadelphia,* 183 F. Supp. 2d 726, 738 (E.D. Pa. 2002) (discussing the fine distinction between sex-based claims and sexual orientation discrimination); *cf. Latta* v. *Otter*, 771 F.3d 456 (9th Cir. 2014) (Berzon, J., concurring) ("the social exclusion and state discrimination against lesbian, gay, bisexual, and transgender people reflects, in large part, disapproval of their nonconformity with gender-based expectations").  This difficulty comes as no surprise, for, as the EEOC stated in its July 2015 decision, "sexual orientation is inherently a 'sex-based consideration,' and an allegation of discrimination based on sexual orientation is necessarily an allegation of sex discrimination under Title VII."  2015 WL 4397641, at *5; *see also Centola* v. *Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002) (observing that "[s]exual orientation harassment is often, if not always, motivated by a desire to enforce heterosexually defined gender norms.  In fact, stereotypes about homosexuality are directly related to our stereotypes about the proper roles of men and women.").

A simple example helps to illustrate the futility of treating sexual orientation discrimination as separate from sex-based considerations:  If an employer fires her female employee because the employer believes that women should defer to men, but the employee sometimes challenges her male colleagues, such action would present a cognizable claim under Title VII.  If the same employer fires her female employee because the employer believes that

women should date men, but the employee only dates women, the prevailing construction of Title VII would find no cognizable claim under that statute.  The inevitable result of holding that some sexual stereotypes give rise to cognizable Title VII claims, while others — namely, those involving sexual orientation — do not, has been an invitation to the precise bootstrapping that the *Simonton* Court intended to avoid.  *See*, *e.g.*, Kristin M. Bovalino, *How the Effeminate Male Can Maximize His Odds of Winning Title VII Litigation*, 53 SYRACUSE L. REV. 1117, 1134 (2003) (counseling "gay plaintiffs bringing claims under Title VII [to] emphasize the gender stereotyping theory and de-emphasize any connection the discrimination has to homosexuality"); *see also Videckis,* 2015 WL 1735191, at *8 (stating that plaintiffs could frame a claim for sexual orientation discrimination as one for sexual stereotyping).

The lesson imparted by the body of Title VII litigation concerning sexual orientation discrimination and sexual stereotyping seems to be that no coherent line can be drawn between these two sorts of claims.  Yet the prevailing law in this Circuit — and, indeed, every Circuit to consider the question — is that such a line must be drawn.  *Simonton* is still good law, and, as such, this Court is bound by its dictates.  Consequently, the Court must consider whether the Plaintiff has pleaded a claim based on sexual stereotyping, separate and apart from the stereotyping inherent in his claim for discrimination based on sexual orientation.  The Court finds that he has not.

In his opposition brief, Plaintiff contends that Cianciotto "abused him because of his effeminate characteristics."  (Pl. Opp. 14).  Were that so, Plaintiff

could likely state a cognizable Title VII claim under Second Circuit law; Plaintiff's pleadings fail, however, to support an inference of discrimination based on a perception that he was overly effeminate.  Plaintiff's brief argues that Cianciotto "accused him of being especially effeminate and that he is a 'bottom' and a 'poof'" because he was insufficiently masculine, but — Plaintiff's use of quotation marks around "poof" notwithstanding — no such name-calling is attributed to Cianciotto in the FAC.  (Pl. Opp. 14).  Rather, the terms "bottom" and "poof" refer to Plaintiff's *own* characterization of the Muscle Beach poster, which depicts Plaintiff in what he repeatedly describes as the "gay sexual receiving position."  (FAC ¶¶ 34, 45).

Plaintiff additionally states that Cianciotto told a coworker that Plaintiff was "effeminate and gay so he must have AIDS."  (FAC ¶ 30 p.9).  This is the sole mention of Plaintiff as effeminate or otherwise non-conforming to traditional gender norms in the whole of the FAC; it alone cannot serve to transform a claim for discrimination that Plaintiff plainly interpreted — and the facts support — as stemming from sexual orientation animus into one for sexual stereotyping.  (*See, e.g., id.* at ¶ 33 ("Cianciotto became openly resentful and hostile towards Plaintiff *because of his sexual orientation*" (emphasis added)).  *See also Trigg* v. *N.Y.C. Transit Auth.*, No. 99 Civ. 4730 (ILG), 2001 WL 868336, at *6 (E.D.N.Y. July 26, 2001) (noting that plaintiff's words and his own perception of the import of the alleged harasser's taunts "compel the conclusion that sexual orientation and not gender stereotyping are the *sine qua non* of his grievance").

35

While Plaintiff provides virtually no support in his FAC for an allegation of discrimination based on sexual stereotyping, he provides multiple illustrations of Cianciotto's animus toward gay individuals. The FAC notes, for instance, the fact that "[m]ost of [the] pictures [Cianciotto] drew were of men fornicating, and they always involved a gay employee"; that he repeatedly expressed a belief that gay men were reckless and disease-prone; and that he commented at a meeting that he did not want an advertisement to be "too gay." (FAC ¶ 30 p.9). All of these examples lend further support to the inference that Cianciotto's harassment was motivated by sexual-orientation-based discriminatory animus, not sexual stereotyping.

The Muscle Beach poster arguably provides an exception to the overall lack of sex-based stereotyping implicit in Cianciotto's actions, as it does indeed place Plaintiff's face on a woman's body, perhaps thereby implying that Plaintiff is effeminate. The Court must, however, consider Plaintiff's FAC as a whole, and nearly every other instance of discrimination alleged by Plaintiff involves a characterization of Plaintiff not as effeminate, but as overtly (indeed, overly) masculine. For instance, Cianciotto is alleged to have said to Plaintiff at a meeting, "Your muscles are big," and "Everybody look at Matt's muscles," and all three of Cianciotto's whiteboard drawings of Plaintiff depict Plaintiff as shirtless and "muscle bound"; one of them depicts Plaintiff with a large, erect penis. (FAC ¶¶ 30 p.7, 34 & Ex. B). Additionally, Plaintiff alleges no facts suggesting that he speaks, dresses, or otherwise behaves in a particularly effeminate manner, nor any facts, beyond possibly the single movie poster, to

suggest that Cianciotto's behavior arose from a perception of Plaintiff as insufficiently masculine.  Plaintiff *does*, however, allege that he presents himself as "openly gay," and that this triggered nearly immediate hostility and resentment in Cianciotto.  (*Id.* at ¶¶ 11, 33).

In short, the Court has "no basis in the record to surmise that [Plaintiff] behaved in a stereotypically feminine manner and that the harassment he endured was, in fact, based on his non-conformity with gender norms instead of his sexual orientation."  *Simonton*, 232 F.3d at 38.  The Court *could* latch onto the single use of the word "effeminate" and the depiction of Plaintiff's head on a woman's body, strip these facts of the context provided by the rest of the FAC, and conjure up a claim for "sexual stereotyping."  But while the ends might be commendable, the means would be intellectually dishonest; the Court would obliterate the line the Second Circuit has drawn, rightly or wrongly, between sexual orientation and sex-based claims.  In light of the EEOC's recent decision on Title VII's scope, and the demonstrated impracticability of considering sexual orientation discrimination as categorically different from sexual stereotyping, one might reasonably ask — and, lest there be any doubt, this Court is asking — whether that line should be erased.  Until it is, however, discrimination based on sexual orientation will not support a claim under Title VII; Plaintiff's Title VII discrimination claim must therefore be dismissed.

## F.   The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's Additional State and Local Claims

Where a federal district court dismisses the causes of action over which it has original jurisdiction, that court then has discretion regarding whether to

exercise supplemental jurisdiction over the plaintiff's remaining state-law claims. 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation and quotation marks omitted); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) ("[W]hen the federal claims are dismissed the 'state claims should be dismissed as well.'" (quoting *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726 (1966))).

In addition to the claims resolved *supra*, Plaintiff claims sexual orientation discrimination under the NYSHRL and NYCHRL; disability discrimination under the NYCHRL; New York State and New York City liability for aiding and abetting the foregoing discrimination; slander *per se*; intentional infliction of emotional distress; breach of contract; and violations of the New York Labor Law. (FAC ¶¶ 105-35, pp. 24-25). In light of the Court's dismissal of Plaintiff's federal-law claims; the early stage of the litigation; and the multiple issues of state law implicated by Plaintiff's remaining claims, the Court declines to exercise supplemental jurisdiction over these non-federal causes of action. *See, e.g.*, *Vuona* v. *Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (disposing of a plaintiff's Title VII and NYSHRL claims because an identical standard applies, but declining to exercise supplemental

jurisdiction over the differently analyzed NYCHRL claims).  The Court therefore dismisses the claims without prejudice to their potential refiling in state court.

## CONCLUSION

For the reasons given in this Opinion, Defendants' motions are GRANTED in full.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      March 9, 2016
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge